## RIVIERE v. McCLINTIC–MARSHALL CORPORATION.

### No. 16744.

Court of Appeal of Louisiana.   Orleans.

Nov. 2, 1937.

St. Clair Adams & Son, of New Orleans, for appellant.

Hugh M. Wilkinson, A. Miles Coe, Harry Nowalsky, John D. Lambert, and George M. Leppert, all of New Orleans, for appellee.

WESTERFIELD, Judge.

Plaintiff, Emile W. Riviere, was injured while working as a "bridgeman" in connection with the erection of the Huey P. Long Mississippi River Bridge. He brought this suit against his employer, the McClintic-Marshall Corporation and its alleged insurance carrier, Aetna Casualty Insurance Company, claiming 400 weeks' compensation at the rate of $20 per week, subject to a credit of 51 weeks for which he had received payment.

The insurance company denied the issuance of the policy in favor of the McClintic-Marshall Corporation, and no attempt was made to controvert this contention. Judgment was rendered dismissing the suit so far as the insurance company is concerned, and it is conceded that that defendant is no longer before the court.

The McClintic-Marshall Corporation answered admitting plaintiff's injury, his employment, his daily rate of pay of $8.80, and substantially all the allegations of plaintiff's petition, and averred that it had paid 51 weeks' compensation at the rate of $20 per week, the last payment being made on July 9, 1935, and that since that date plaintiff has been able "to return to the same form of employment that he was engaged in at the time of his injury, since July 9, 1935; that if plaintiff has any slight degree of permanent loss of use of his leg, it is not of a sufficient degree to entitle him to compensation over and above the amount which he has already received."

There was judgment below in plaintiff's favor as prayed for, and defendant has appealed.

Riviere was injured on July 10, 1934, while working in the "raising gang," whose duties involved the placing of steel girders in position, climbing the girders, walking on the rails, and otherwise hazardous activities. He suffered a "compound-comminuted fracture of the tibia and fibula of the left leg with injuries to and stiffening of the patella and knee joint," resulting in a permanent shortening of the leg of about 1 inch.

Immediately after the accident, Riviere's employer caused him to be treated by Drs. Phillip and Harrison, particularly Dr. Roy B. Harrison. For 51 weeks it paid Riviere compensation and paid for his medical attention. It refused to make further payments of compensation or for medical services upon the ground that plaintiff was then in a position to resume his former employment. However, Dr. Roy Harrison, with commendable kindness and consideration, continued to treat Riviere for a long time thereafter, notwithstanding the fact that Riviere told him that he was unable to pay for his services which, consequently, were gratuitous.

Dr. H. Theodore Simon testified on behalf of plaintiff: He saw Riviere on March 28 and 29, 1935, at which time, he was wearing a moulded socket leg brace attached to his shoe. Dr. Simon stated that "the union of the fracture apparently was solid from a clinical standpoint. There was an inch and a quarter shortening of the leg, of the left lower extremity. The muscles were fairly active, and showed good power." He examined some X-ray plates taken at the Charity Hospital some time previously, and, speaking of these plates, said: "These plates showed a well healed fracture of the tibia at the junction of the middle third. It was comminuted, and there was a marked overlapping of the bone, and a large protrusion of the sharp bone into the soft parts on the side of the leg. The general weight alignment was good. There was also a healed oblique fracture of the fibula at the same level, with an over ride of about one inch. At that time I gave the opinion that there was a bony union in these fractures, and that the union was solid, and was sufficient to bear weight without the brace that he was wearing, and the sharp bony spicule was advised removed, as I felt that it was giving pain."

Dr. Simon saw Riviere again on February 5, 1937, when he found the condition of his left leg to be the same, but on this examination he found "a marked pelvic tilt, and a curvature of the spine, because of the shortening of the leg, of the left lower limb." Dr. Simon was of opinion that Riviere could not resume his occupation as a structural steel worker.

Doctors J. T. O'Ferrall, Edward S. Hatch, J. Kelly Stone, and Roy B. Harrison testified on behalf of defendant.

Dr. Hatch examined plaintiff on March 25, 1935. It was his opinion that within three or four months after that date Riviere would be in a position to do full duty as a structural steel worker. Following an examination which he made of the plaintiff on June 28, 1935, Dr. Hatch expressed himself as follows in a letter to to the Aetna Casualty Insurance Company:

"I am sure that the patient will go back to work as soon as his case is disposed of, and while I do not believe that he has practically any disability, I feel it is probably best if this can be done, to settle with him on a fifteen per cent. permanent partial disability rate in the use of his left leg."

Dr. J. T. O'Ferrall examined Riviere on July 3, 1935, and on March 5, 1937. Following the second examination he wrote Dr. Harrison as follows:

"As per your request, I have examined the above named, and it is my opinion that his condition remains substantially the same as upon my examination of July 3, 1935.

"The physical findings at this time, as far as the left tibia and fibula are concerned, are as follows:

"In walking the patient does so with hyperextension of the left knee. There is a limp indicating a shortening of the left leg. Measurement reveals that there is one inch shortening of the left leg. ½ inch atrophy of the left thigh and ¼ inch atrophy of the left calf. All motions of the knee are normal, with the exception of the slight hyperextension when weight bearing, all motions of the ankle joint are normal, except dorsal flexion of the foot, reveals a spasm of that portion of the plantar fascia extending to the large toe. There is still some tenderness over the distal end of the proximal fragment on the mesial aspect of the leg at the site of the fracture.

"It is my opinion that the claimant's condition remains about the same as of last examination, with the exception of the slight increased shortening. It is evident that the patient has been actively using this leg, as the atrophy of the thigh and calf is, less than upon last examination. I believe, however, that a fair estimate of his disability remains the same as upon last examination, that is, about 50% disability of the affected leg, referring to that member alone."

Dr. Stone expressed the opinion that Riviere was capable of returning to work as a structural steel worker or bridgeman and could do "any type of work that does not require his safety upon the full weight of his body being held with this injured leg."

Dr. Harrison, to whose testimony we attach great weight because of the fact that he is the only doctor who treated Riviere continuously during his disability, was paid for his services up to August 21, 1935, by defendant's insurer. He testified, however, that his treatment continued for "a good, long time after. In fact, I have seen Mr. Riviere up until the last six months. He used to come up here at irregular intervals up to about December of last year." As a matter of fact, Dr. Harrison never did discharge Riviere. The nature of the treatments consisted in baking plaintiff's leg and some internal medication. His last examination of Riviere occurred on the 12th day of February, 1937, when an X-ray picture was taken. As a result of this examination, Dr. Harrison found that plaintiff's left leg was three-fourths of an inch shorter than his right. The bony prominence at the site of the fracture, Dr. Harrison testified, was becoming more rounded than it had appeared in previous pictures. He also said that Riviere had no curvature of the spine. As a matter of fact, all the doctors, with the exception of Dr. Simon, agree that there was no curvature but a listing of the spine. Dr. Harrison also testified that there was, at the time of the trial, a 50 per cent. disability in the use of his left leg, thus agreeing with Dr. O'Ferrall. When asked as to whether he had a permanent disability which would disqualify him from doing work of a reasonable character, Dr. Harrison replied: "Well, I think that the disability that I said, the fifty per cent permanent disability of the leg, but I think there are other types of work that he can certainly do."

When asked whether he could work as a bridgeman and after being informed of the duties of one holding that position, he replied: "Well, to my mind, as far as a steel worker is concerned, it is a question entirely as to whether the individual is used to that type of work. I don't see any way that you could stop Mr. Riviere from working, except with the shortening, and I don't know what else would stop him. A lot of those fellows with short legs work as steel workers. That is the only thing I can go by."

Plaintiff produced several lay witnesses. One of them, Rasmussen, who had been engaged in structural steel work all of his life, and who had acted as superintendent of the employment of structural steel workers, testified that he would not employ plaintiff in his present physical condition. Another witness, Weinberg,

business manager of the International Association of Bridge and Structural Ornamental Iron Workers, stated that he would not hire plaintiff in his present condition "if it was my job." Ryall, president of the International Association of Bridge and Structural Iron Workers, testified that if he were a foreman erecting a bridge he would not employ plaintiff. Another witness by the name of Hunt corroborated Ryall, Rasmussen, and Weinberg.

Defendant produced James C. Thomas, president of the Bridge and Building Directors Guild of the City of New York, who had a leg shortened as a result of an accident and a stiff ankle. He testified that he had returned to work eleven months after his injury, and has been constantly employed since that time as a bridgeman and structural steel worker.

George Kloven, presently employed by the defendant, suffered an accident in March, 1928, which resulted in four fractures of his left leg and three of his right which reduced his height by about $3\frac{1}{8}$ inches and caused a 1 inch difference in the length of his legs. Kloven testified that he had no difficulty in performing his duties as a bridgeman and structural steel worker.

■ We are not much impressed by the evidence of the lay witnesses, and have reached our conclusion very largely upon the testimony of the physicians, all of whom are shown to be eminent men in their profession, and all of whom with the possible exception of Dr. Hatch, conceded that as a structural steel worker or bridgeman the plaintiff in this case would be incapacitated to the extent that it would be impossible for him to do any climbing which would result in pressure upon the protruding or overlapping bone near his ankle. They were also unanimous in the opinion that plaintiff's left leg is 50 per cent. disabled. In fact, defendant's counsel urge us to grant compensation upon that basis under section 8, subd. 1 (d), par. 15 (Act No. 242 of 1928, p. 358). But this is not a case of specific injury to a member without disability, it is a claim for disability. McGruder v. Service Drayage Company, Inc., 183 La. 75, 162 So. 806.

■ We have no difficulty in reaching the conclusion that Riviere could not resume his occupation as a structural steel worker with satisfaction to his employer or with safety to himself. However, we do not believe that the evidence justifies a finding that plaintiff is, at this time, unable to perform any "work of any reasonable character." The words "work of any reasonable character" mean, as has been stated in Custer v. New Orleans Paper Box Factory (La.App.) 170 So. 388, 392, "work of the kind for which the injured party is fitted by status, training, and education." They do not, however, mean the identical employment in which the injured party was engaged before the disabling accident. For example plaintiff could be employed by a bridge builder in some clerical capacity or in some position which did not require much laborious exertion, and he might also be employed in many other occupations though he has been engaged for fifteen years in structural steel work. He is entitled to temporary total disability for the length of time that he was receiving medical treatment for his injuries at the hands of Dr. Harrison, the attending physician, and to partial disability thereafter. Section 8, subdivision 1 (a) and (c) of the Compensation Statute, Act No. 242 of 1928, p. 357, read as follows:

"(a) For injury producing temporary total disability to do work of any reasonable character, sixty-five per centum of wages during the period of disability, not, however, beyond three hundred weeks.

* * *

"(c) For injury producing partial disability to do work of any reasonable character, sixty-five per centum of the difference between wages at the time of injury and wages which the injured employee is able to earn thereafter during the period of disability, not, however, beyond three hundred weeks."

■ We are unable to fix the date when the total disability ceased and partial disability began, for Dr. Harrison testified that he treated Riviere for his injuries long after the defendant ceased to pay him compensation. He said he was treating him as late as December, 1936, but we find that an X-ray plate was taken on February 12, 1937, and the doctor testified that he had never discharged Riviere. Nor are we in any better situation with respect to the permanent partial disability. Indeed, we can be less certain in that regard, for we are not able to fix the amount of compensation because there is nothing to show what Riviere is able to earn with his shortened leg and 50 per cent. loss of

function. He testified that he had not been able to obtain employment of any kind since his injury. In order to compute his compensation, we must have some information as to what he is able to earn in his disabled condition. His inability to obtain employment after an honest effort to do so would doubtless be a factor, but not necessarily a controlling one in the determination of what he is able to earn.

Evidence should be adduced which will enable the court to compute his compensation as the law contemplates, that is to say, at 65 per centum of the difference between $8.80 which he earned in his former occupation and the wage he is able to earn in his present state of partial disability. Evidence should also be adduced for the purpose of showing with greater certainty the extent of plaintiff's total disability, and for these purposes we have concluded to remand the case.

For the reasons assigned, the judgment appealed from is annulled, avoided, and reversed, and it is now ordered that this case be remanded to the Twenty-Fourth judicial district court for the parish of Jefferson for further consideration according to law, and not inconsistent with the views herein expressed.

Reversed and remanded.